IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GERALD SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:11-CV-640-WKW |
| | ) [WO] |
| PERDUE FARMS, INC., | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

This case involves the proper care and feeding of the domestic chicken (*Gallus gallus domesticus*). Until June 2, 2010, Plaintiff Gerald Smith was an independent chicken grower under contract with Defendant Perdue Farms, Inc. The termination of that relationship gave rise to this action, and the matter comes before the court on Perdue's motion for summary judgment (Doc. # 12). Mr. Smith filed a response in opposition (Doc. # 14), to which Perdue replied (Doc. # 17). For the reasons that follow, summary judgment is inappropriate, and Perdue's motion is due to be denied.

### I. JURISDICTION AND VENUE

Subject matter jurisdiction over this removed action is exercised pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441(a). The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant Perdue Farms, Inc., breeds and hatches chickens, but it does not raise them.  Instead, Perdue relies upon a network of independent local farms to raise its chicks to maturity.  At these farms, the chickens live in state-of-the-art chicken houses with access to plenty of food and water.  The chickens are protected from weather, predators, and disease.  Perdue employs an army of specialists to keep the chickens healthy and happy, including veterinarians, scientists, lab technicians, and flock supervisors – there is even a position called "poultry welfare officer."  Sometimes, for a short time, it is good to be a chicken.

Plaintiff Gerald Smith, a chicken farmer, runs two chicken houses that hold 10,000 chickens each.  Every nine weeks or so, Mr. Smith takes delivery from Perdue of about 20,000 live chicks.  Mr. Smith's responsibilites include, among other things, checking to ensure the chickens have access to food, regulating the temperature in the chicken houses, and "picking up the dead."  (Summ. J. Br. 3 (Doc. # 13).)  According to Mr. Smith, Perdue did not always make its food deliveries on time.  When the feed ran out, the chickens would go hungry.  Once the chickens were fattened for the slaughter, they were collected by Perdue and taken to their terminal destination.  It is not always good to be a chicken.

This arrangement between Mr. Smith and Perdue (and its predecessor) lasted approximately twenty years. On October 27, 2004, Perdue executed its most recent contract with Mr. Smith. That contract has since been twice amended, including a December 16, 2009, change to the termination clause. Mr. Smith was also asked to sign an arbitration agreement with Perdue (which he refused to do). As Mr. Smith tells the story, it was upon that refusal that things started to go downhill.

At any rate, a Perdue representative met with Mr. Smith to discuss his six-flock average (a complicated measure of chicken-growing performance set out in the contract). According to Perdue, Mr. Smith's six-flock had fallen below pre-defined performance standards, which were set by the contract. In line with other provisions of the contract, the Perdue representative gave Mr. Smith a written Performance Improvement Plan to help bring his six-flock up to par.

But Mr. Smith's six-flock did not significantly improve. In a letter dated February 23, 2010, Perdue notified Mr. Smith his six-flock had fallen below a minimum standard and he was, in accordance with the contract, being placed on a sort of probation. The letter notified Mr. Smith that his next flock (Flock 63) would have to meet at least one of three specified goals. In the event that Flock 63 failed to meet any of the goals, the date on the letter would serve as notice that Perdue was terminating his contract.

Flock 63 failed to meet all three goals. On June 2, 2010, Perdue notified Mr. Smith the contract was terminated. More than ninety days had passed since the February 23 letter, which accorded with the contract's termination provision: "Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party." (Summ. J. Br. 6.)

On June 30, 2011, Mr. Smith sued Perdue in state court for breach of contract. According to Mr. Smith, Flock 63's poor performance was Perdue's fault because a late delivery left the chickens without feed for a weekend. Mr. Smith also disputes the accuracy of the six-week average Perdue cited when it terminated his contract. According to Mr. Smith, "[he] did everything he knew to do to grow a good chicken and took care of his stuff inside the houses." (Summ. J. Resp. 2 (Doc. # 14).) But that was not good enough for Perdue, he claims, for it "wanted him out of the business because his farm was too small to worry with." (Summ. J. Resp. 2.)

### III.  STANDARD OF REVIEW

Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the moving party "always bears the initial

4

responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the nonmovant has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24. "[T]he court must view all evidence and make all reasonable inferences in favor of the [nonmovant]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Rule 56(e)(2). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## IV. DISCUSSION

At this stage, neither the validity of the contract between Mr. Smith and Perdue nor either of its amendments is in dispute. Accordingly, by the terms of the

instrument, either party had the right to terminate at any time, for any reason, provided proper notice was given. It is undisputed that Perdue sent Mr. Smith a letter giving notice more than 90 days before it terminated the contract, so none of the written terms of the agreement were breached.

That conclusion, however, is not sufficient to resolve this dispute. In addition to the express terms of the contract, the law of Maryland (which the court applies pursuant to the contract's choice of law clause) imposes an unwritten condition giving rise to "an implied duty of good faith and fair dealing." *Blondell v. Littlepage,* 991 A.2d 80, 90 (Md. 2010). The duty of good faith does not impose any affirmative duties on the parties beyond those in the express terms of the agreement. *Id.* "Rather, [it] simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. 1992)). It was by violating the implied duty of good faith that Mr. Smith claims Perdue breached the contract.

To that end, Mr. Smith first argues that the "six flock [Perdue] used as his six flock was not [his] six flock." (Summ. J. Resp. 2.) This argument fails for a lack of evidence before it ever gets off the ground. Although Perdue has produced evidence that one particularly bad flock was excluded from the calculation of the final six-flock average (a move that could only have changed the average for the better), Mr. Smith

has presented no evidence, beyond a bare assertion, that Perdue's numbers are inaccurate. On summary judgment, Mr. Smith cannot simply quibble with the numbers Perdue has offered; he must come forward with evidence sufficient for a reasonable jury to conclude Perdue's figures were wrong. *Damon*, 196 F.3d at 1358. That he has not done.

The only other grounds upon which Mr. Smith has claimed Perdue breached its duty of good faith is the delivery of a "split load" of feed to his final flock. Perdue does not deny (or admit, for that matter) that this split load was delivered. Instead, Perdue argues that Mr. Smith has not presented sufficient evidence to indicate the split load, even if it occurred, adversely affected his final flock's performance numbers. Mr. Smith, however, has submitted evidence in the form of an affidavit that "[w]hen there was no split load [his] chickens did better." (Summ. J. Resp., Ex. A. 2.) Further, the Performance Improvement Plan Perdue submitted specifically lists "no split loads." (Summ. J. Br., Ex B. 33) A reasonable jury might conclude that Perdue would not have listed "no split loads" on a performance improvement plan unless split loads had an adverse effect on performance. That, coupled with Mr. Smith's sworn testimony, is sufficient to create a question of material fact regarding the effect the alleged split load had on Mr. Smith's final flock.

Such a question cannot be resolved on summary judgment.  If Mr. Smith can prove at trial that Perdue delivered a split load of feed that caused Flock 63's failure to meet the required performance goals, then Perdue "act[ed] in such a manner as to prevent [Mr. Smith] from performing his obligations under the contract." *Blondell,* 991 A.2d at 90.  If that is the case, then Perdue breached the implied duty of good faith imposed by law upon its contract with Mr. Smith.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 12) is DENIED.

DONE this 9th day of October, 2012.

                                                   /s/ W. Keith Watkins
                                     CHIEF UNITED STATES DISTRICT JUDGE